IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| : | Criminal No. 1:08-CR-270 |
| v. : | |
| : | (Chief Judge Kane) |
| SHAWN C. DILLARD, : | |
| Defendants. : | |

**MEMORANDUM**

Before the Court is the Defendant's Motion for a New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Doc. No. 78.) The motion is ripe for disposition. For the reasons that follow, the motion will be denied.

**I.    BACKGROUND**

The Defendant, Shawn Dillard ("Dillard") was charged in connection with activities relating to his duties as a member of the Pennsylvania State Police by indictment filed on July 2, 2008, which was amended by superseding indictment filed on March 11, 2009. (Doc. No. 30.) Specifically, the superseding indictment charged Dillard with conspiring to impede the due administration of justice and to promote interstate prostitution in violation of 18 U.S.C. § 371 (Count One); impeding the due administration of justice in violation of 18 U.S.C. § 1503 (Count Two); aiding and abetting interstate prostitution in violation of 18 U.S.C. § 1952(a)(3) and 2 (Count Three); Hobbs Act extortion in violation of 18 U.S.C. § 1951(a) (Counts Four through Seven); and making false statements to law enforcement officials in violation of 18 U.S.C. § 1001 (Counts Eight and Nine). (Id.) Dillard pleaded not guilty to the charges in the superseding indictment and trial commenced on May 11, 2009. After a three day trial, the jury rendered its verdict on May 14, 2009, finding the Defendant guilty on Counts Two, Three, Eight and Nine

and acquitting him of Counts One, Six and Seven.[1] On May 28, 2009, the Court granted Dillard's motion to continue post-trial motion deadlines, and on June 18, 2009, Dillard timely filed the present motion for a new trial. The motion concerns an event that occurred during the Government's rebuttal closing argument. During argument, the prosecutor displayed a document on the courtroom monitors marked Government Exhibit 7.2 ("Document"), a facsimile of an FBI 302 report describing an interview with Dillard, for the purpose of highlighting to the jury inconsistent statements Dillard had made to the FBI agents in the process of the investigation. (Trial Tr. 506.) The Document included the following text:

> On June 30, 2008, SHAWN C. DILLARD appeared at the PHILADELPHIA DIVISION of the FBI . . . . DILLARD arrived with his lawyer . . . to voluntarily participate in a polygraph examination conducted by Special Agent GERARD O'CALLAGHAN. Before and after the polygraph examination, DILLARD agreed to be interviewed by SA O'CALLAGHAN and SA William W. MAGEL. . . .
>
> The entire proceedings were monitored, but not recorded, via audio/video surveillance from a camera inside the interview room that was plainly seen and not concealed. SA O'CALLAGHAN advised DILLARD that the proceedings would be monitored, but not recorded, and he acknowledged that he understood. [The investigating officers] watched DILLARD's pre-interview, polygraph examination, and post-interview via a television monitor in a separate room that provided both video and audio. . . . Below are SA LYNCH's observations of DILLARD's post interview . . . .
>
> During DILLARD's post interview, DILLARD stated that he had sexual intercourse with ANDREA RILEY. SA O'CALLAGHAN told DILLARD that he had previously claimed not to have had sex with RILEY. DILLARD stated that this was incorrect. SA O'CALLAGHAN told DILLARD that he had read SA LYNCH's interview with DILLARD and that, in it, DILLARD clearly stated that he did not have sex with RILEY because he could not achieve an

---

[1] Counts Four and Five were withdrawn by the Government.

> erection. DILLARD stated that this was not correct, and that SA LYNCH had made a mistake or had misunderstood him. SA O'CALLAGHAN told DILLARD that SA LYNCH had written a very detailed, 15-page FD-302 interview report, that agents very rarely write such detailed reports, and that the report very clearly described DILLARD's statement on the matter. DILLARD stated that SA LYNCH's FD-302 was incorrect and that he had admitted to have sex with RILEY during his initial interview.

(Doc. No. 80.) While it is not clear from the record, it appeared during the proceedings that the Government intended to use a split-screen display on the monitor to highlight inconsistent statements made by Dillard during two separate FBI interviews. The split-screen display did not work, however, so the Government was forced to pull up each document and then crop to the pertinent language to display the comparison to the jury. It was during this transition that the remaining contents of the Document were displayed to the jury, including the references to Dillard's polygraph examination. The Government represents that this "glitch" with the split-screen monitor did not occur in pre-trial testing and that the references to Dillard's polygraph examination were displayed inadvertently. (Doc. No. 85 at 9, 18.) It does not appear that Dillard contests the Government's explanation, and it is consistent with the Court's recollection of the proceedings. As such, the Court finds the references to Dillard's polygraph examination were displayed inadvertently by the Government.

While the entire Document was shown on the courtroom monitors, only the third paragraph, referencing Dillard's statements about his interactions with Andrea Riley, was highlighted in yellow and referenced by the prosecutor in his argument to the jury. (Trial Tr. at 506.) Upon noticing the polygraph references, counsel for Dillard requested a sidebar conference and the monitors were cleared. (Id..) After alerting the Court to the issue, Dillard's counsel moved for a mistrial based on the references in the Document to Dillard's polygraph

3

examination, which the Government opposed.[2] The Court denied this motion, finding:

> My own view of it is that the document was on the screen for seconds, at most. I was not able to read the document from where I sit, and I doubt that the jurors were, either. . . . The document filled the screen, and the agent was directed to zone in on part of the document. And the prosecutor then began to read from the bottom paragraph beginning "during Dillard's post-interview." I am doubtful that the jurors even read or saw the first two paragraphs where there is a reference to the words "polygraph examination." I don't think it would be very helpful or advisable to poll them on that matter at this point. I can't find, under all the circumstances, that there is a necessity for a mistrial . . . .

(Id. at 511.) After trial, the Court requested that the court reporter supply a time-stamped portion of the trial transcript for the exchange at issue. From examination of the time-stamped transcript, included as an exhibit to this memorandum, it appears the Document was displayed at around 2:50:26 p.m. and removed at around 2:50:43 p.m., for a total display time of around 17 seconds. Though admittedly a precise measurement is not possible, it is reasonable to find, considering the Court's recollection of the proceedings and the time-stamped transcript, that the Document was displayed for no more than 20 to 25 seconds.

## II. DISCUSSION

Dillard raises the same arguments in the present motion as he did at trial in favor of a mistrial, contending that displaying the Document deprived him of his right to a fair trial. (Doc. No. 79 at 5.) In support of this contention, he argues that publishing the exhibit was improper, the Government's case was not overpowering, and Dillard's credibility was the cornerstone of his defense because he elected to take the stand. (Id. at 4.) The Government disputes these contentions, arguing:

---

[2] Counsel did not request that the Court instruct the jury to disregard any reference to a polygraph examination.

> (a) the document was highlighted at the bottom of the page, (b) the word "polygraph" was not highlighted and was at the top of the page, (c) it was on the screen for a matter of seconds, (d) the document itself did not state the results of the polygraph not the questions asked, and (e) the agent testified only that he had met with Dillard and his attorney, had discussed the apparent inconsistency between the two statements with Dillard, after which Dillard and his attorney left. Moreover the evidence of guilt was overwhelming . . . .

(Doc. No. 85 at 11.)

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the Defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." One ground on which a new trial may be granted under Rule 33 is that error at trial had a substantial influence on the verdict.[3] United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993); see also United States v. Ortiz, 182 F. Supp.2d 443, 446 (E.D. Pa. 2000) (citing Government of the Virgin Islands v. Bedord, 671 F.2d 758, 762 (3d Cir. 1982)). The decision to grant or deny a motion for a new trial lies within the discretion of the district court. United States v. Vitillo, 490 F.3d 314, 325 (3d Cir. 2007) (citing United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006)).

Dillard relies on two cases from other circuits in support of his motion. In United States v. Murray, the Sixth Circuit reversed a conviction and ordered a new trial after a prosecution witness mentioned the words "polygraph examination" in connection with his investigation of the Defendant on the stand. 784 F.2d 188, 190 (6th Cir. 1986). The court determined that a new trial was warranted because the comment was introduced deliberately by the Government

---

[3] A defendant may also move for a new trial on the ground that the jury's verdict is contrary to the weight of the evidence. See United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003). Motions for a new trial based on weight of the evidence are not favored, so they should "be granted sparingly and only in exceptional cases." Id. Defendant does not appear to raise weight of the evidence as a ground for granting him a new trial in his motion, and to the extent he does, the Court rejects that contention for largely the same reasons as discussed below.

5

witness and because the evidence of guilt was not strong enough to say that the error was harmless. Id. at 188-89. The concurrence disagreed with this conclusion, id. at 192, and the majority also made clear that, to the extent they had doubt that the mention of the polygraph examination mandated a new trial, "we do not think we would be able to escape the conclusion that the errors in the charge (when added to the [mention of the polygraph examination]) were together sufficiently serious to represent reversible error" id. at 189. The court also held that a new trial was not due in all such cases: "[w]e do *not* hold that under any and all circumstances in every case where the words "polygraph examination" are mentioned, a grant of a new trial would be required." Id.

Dillard also relies on United States v. Brevard, where the Fourth Circuit reversed a conviction and ordered a new trial after an FBI agent referenced the defendant's polygraph examination three times in the course of his testimony. 739 F.2d 170, 181-82 (4th Cir. 1984). As the Government points out, the court found that the references warranted a new trial largely because of their content: "The FBI agent who made the remarks testified that, before going to the FBI office with Brevard for the polygraph test, 'I didn't know at that time whether to believe his story or not.' Because the FBI had not charged Brevard before the visit, and he was subsequently indicted, the jury could have inferred that the decision to proceed against him was based partly on the results of the polygraph test and that Brevard had failed it." Id. at 182-83. The court also noted that the defendant's credibility was especially vital at trial because the testimony of eyewitnesses against him was inconsistent and other evidence against him was "circumstantial and partially conjectural." Id. at 83.

Both of these cases are distinguishable from the circumstances present here. As the

6

Court found above, the Government displayed the Document to the jury inadvertently due to technical problems with the courtroom monitors. Dillard's polygraph examination was not verbally referenced by either the prosecutor or a Government witness. Indeed, the Document containing the references to the polygraph was only displayed momentarily on the courtroom monitors and the prosecutor solely discussed its third paragraph, which was highlighted and contained no references to a polygraph. Additionally, the references to the polygraph examination in the Document are ambiguous at best, as the Document never reveals the result of the examination. (Doc. No. 80.) Dillard argues that the prejudice was exacerbated because agent O'Callaghan, who administered the polygraph, testified during the trial and "emphasized how he was asked to evaluate the 'truthfulness' of the Dillard's statements." (Doc. No. 79 at 4.) The Court agrees with the Government that this contention is speculative, however, because O'Callaghan's testimony was directed specifically at explicit discrepancies in Dillard's statements to agents over the course of the investigation; the polygraph examination was never mentioned. (Trial Tr. 349-50.) Therefore, as the Court found in denying the motion for a mistrial, it is unlikely that the jurors ever saw the polygraph reference or, even if they did, that the reference would be prejudicial to Dillard.[4]

Even assuming the jury did take note of the reference to the polygraph, this case is also distinguishable from Murray and Brevard because the evidence of guilt was overwhelming on the charges of conviction. Melissa Jacobs, a woman being prostituted at the time by Derek Maes, testified at length about her interactions with Dillard, starting after he first arrested her for prostitution related offenses. (Trial Tr. 79-80.) After being arrested, she was escorted to the

---

[4] This conclusion is only supported by the fact that the jury returned a discriminating verdict, acquitting Dillard on Counts One, Six and Seven.

7

state police barracks and taken into a small room with another woman where she had intimate contact with Dillard:

> Q: And what happened there?
>
> A: And while me and Heaven were joking around with Trooper Dillard, I gave him a lap dance and –
>
> Q: For the uninitiated, what is a lap dance?
>
> A: I was rubbing my butt on his private area.
>
> Q: And how long did that go?
>
> A: For about 15, 20 minutes.
>
> Q: And did Mr. Dillard touch you in any way?
>
> A: Yeah.
>
> Q: How?
>
> A: Like on my legs, on my chest.

(Id. at 80-81.) After this, Dillard requested Jacobs's phone number. Dillard subsequently passed information to her and other women about when police raids were going to occur at the truck lots where prostitution activity was taking place. (Id. at 86.) She also testified that Dillard had picked her up during a raid and hid her from other officers in his police cruiser until Atlas Simpson, a taxi-driver that worked with the pimps, could come pick her up. (Id. at 87.) Jacobs's testimony regarding her interactions with Dillard was corroborated by other evidence at trial, including phone records (id. at 90) and other testimony. Specifically, portions of Derek Maes's testimony (id. at 163), Corporal Kenneth Hassinger's testimony (id. at 183-84), and Atlas Simpson's testimony (id. at 232-33) corroborate Jacobs's account of these occurrences.

Tana Adkins, a woman being prostituted at the time by Kenneth Britton, also testified

that Dillard passed her information about law enforcement activities on the truck lots. (Id. at 114.) Specifically, she testified that, after being arrested on April 13, 2005, she was taken to the state police barracks where Dillard was on duty. (Id.) Dillard twice quietly insinuated that she should announce that she needed to go to the bathroom, which she did. (Id. at 115.) Dillard personally escorted her to the bathroom, and there, partially leaning in the door, he warned her that undercover troopers were going to be on the truck lot over the weekend and that she and the other girls should stay off the lots. (Id. at 116-117.) Adkins's testimony about this incident is corroborated by other witnesses and evidence presented at trial. Corporal Hassinger testified that he witnessed Dillard escort Adkins to the bathroom after her arrest on April 13, 2005, and believed that they had engaged in conversation while she was in the bathroom. (Id. at 186-88.) Hassinger believed that Dillard's interaction with the women was inappropriate and suspected from his demeanor that Dillard may have a relationship with the women on the lot, specifically Jacobs and Adkins. (Id.) Kenneth Britton's testimony also corroborated Tana Adkins. He testified that on April 14, 2005, Adkins phoned him and relayed the conversation with Dillard that took place in the bathroom of the state police barracks, specifically describing undercover operations that were to take place at the Gables Truck Lot involving undercover officers from York. (Id. at 140.) After receiving the report from Adkins, Britton relayed this information to Derek Maes, a pimp co-conspirator, over the phone and both pimps decided to pull the women they were prostituting out of Harrisburg. (Id. at 141.) Britton's and Adkin's testimony was further corroborated by Derek Maes and also a recording of an intercepted telephone conversation between Britton and Maes on April 14, 2005, discussing the undercover operations on the Gables Truck Lot. (Id. at 142-43.)

9

Considering the above, the Court must agree with the Government that new trial is not warranted here. Given the brevity of the display of the document and the fact that the jurors' attention was directed away from the offending content by yellow highlighting emphasizing other content, it is extremely unlikely that the jurors took note of the momentary references to the polygraph examination which were not highlighted or verbally referenced by the prosecutor in his argument. Even if the jurors did take note, the references were ambiguous at best, and not necessarily prejudicial to Dillard, especially considering the overwhelming evidence presented on the charges of conviction. As such, the references to Dillard's polygraph examination did not have a substantial influence on the verdict or deprive Dillard of his right to a fair trial; his motion for a new trial will be denied.

## III. CONCLUSION

For the foregoing reasons, Defendant Dillard's motion for a new trial (Doc. No. 78) will be denied. An order consistent with this memorandum will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| : | **Criminal No. 1:08-CR-270** |
| v. : | |
| : | **(Chief Judge Kane)** |
| SHAWN C. DILLARD, : | |
| Defendants. : | |

## ORDER

**AND NOW**, on this 4th day of February 2010, upon consideration of Defendant's motion for a new trial (Doc. No. 78), and for the reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY ORDERED THAT** the motion is **DENIED**.

  S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania